C. H. WENTWORTH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51260. Filed March 12, 1956.

*Eric L. Burton, Esq.*, for the petitioner.
*Mark Townsend, Esq.*, for the respondent.

### OPINION.

MULRONEY, *Judge:* The respondent determined a deficiency in income tax for the calendar year 1947 in the amount of $60,902.38. The only issue is whether a distribution of $200,000 in 1947 to the petitioner by a corporation, in which he was the controlling stockholder, was a taxable dividend to the extent of earnings and profits or a repayment of a loan, evidenced by notes, made by the petitioner to the corporation in prior years. All of the facts are stipulated and are now found accordingly.

The petitioner is an individual with his principal office at Los Angeles, California. His original and amended income tax returns for the calendar year 1947 were filed with the then collector of internal revenue for the sixth district of California.

On January 1, 1943, the petitioner transferred to a newly formed corporation, the Flexo Manufacturing Company, Inc. (hereinafter called corporation), substantially all of the assets of a sole proprietorship business carried on by the petitioner under the firm name of Flexo Manufacturing Company. The assets so transferred were as follows, shown at cost:

| | |
|---|---|
| Cash in bank | $12,704.63 |
| Accounts receivable | 105,922.97 |
| Inventory | 55,685.71 |
| Furniture | 286.67 |
| Machinery and equipment | 18,073.64 |
| Auto and equipment | 3,235.30 |

The following liabilities and reserves were also transferred by the petitioner to the newly formed corporation:

| | |
|---|---|
| Accounts payable | $10,793.54 |
| Reserve for Federal old age benefits tax | 272.40 |
| Reserve for Federal payroll excise tax | 108.40 |
| Reserve for California unemployment insurance tax | 503.83 |
| California sales tax | 6.10 |
| Notes payable | 4,500.00 |
| Bonus payable | 11,371.18 |
| Reserve for bad debts | 4,544.49 |
| Reserve for depreciation—machinery and equipment | 7,836.81 |
| Reserve for depreciation—autos and equipment | 3,235.30 |

The transfers of the assets, liabilities, and reserves by the petitioner to the corporation resulted in a capital contribution to such corporation, on a book basis, in the amount of $152,737.44.

The petitioner received from the corporation, in exchange for the transfer, 120,830 shares of stock with a par value of $1 per share, of which he transferred 5 qualifying shares to Robert Steele. The stock was issued on September 26, 1944. The corporation sold 4,167 shares of stock for cash to Lloyd Wallmer, making a total of 124,997 shares of stock outstanding.

An open account in petitioner's name was maintained on the books of the corporation with the heading "Accounts Receivable—C. H. Wentworth." On February 27, 1943, this account had a credit balance of $2,197.20. On that same date the petitioner advanced $100,000 to the corporation and received a note in the face amount of $100,000, maturing in 1 year and bearing 6 per cent interest. On April 14, 1943, the open account had a credit balance of $3,397.20, and on the same date the petitioner advanced an additional $100,000 to the corporation, receiving back an additional note in the face amount of $100,000, also maturing in 1 year and bearing interest at 6 per cent. Both notes were carried on the corporate books as "notes payable." On December 31, 1943, the open account on the corporation's books in the petitioner's name reflected a debit balance of $197,211.03.

On October 31, 1944, the petitioner's open account had a debit balance of $200,742.60. The corporation on that date credited the open account with $180,000, leaving a debit balance in the account of $20,742.60, and at the same time charged its capital account, which resulted in a capital deficit of $23,095.56. No charge or entry was made to the notes payable account, nor were the notes payable in the amount of $200,000 canceled.

No income was reported by the petitioner on his individual income tax return for the calendar year 1944, or for any other year, as resulting from the credit of $180,000 made by the corporation to his open account. The petitioner did not exchange any stock with the corporation or surrender any stock to the corporation, nor has there been any liquidation or partial liquidation of the corporation.

On December 31, 1943, the earned surplus account of the corporation showed a credit balance of $114,322.19, and on December 31, 1944, the credit balance in this account was $171,920.38. The earned surplus of the corporation, on December 31, 1947, was $82,522.06.

In May 1947, the corporation distributed to the petitioner the sum of $200,000. At the same time, the petitioner surrendered to the corporation the two notes of the corporation made out in 1943 and maturing in 1944. The notes payable account on the corporation's books was debited with the amount of $200,000, and the notes were canceled.

The ultimate question in this case is whether part of the note indebtedness was paid in years prior to 1947. The parties to the notes were the corporation, payor, and the petitioner, payee, but the payee completely controlled and dominated the payor. It is worth consideration that petitioner at all times had the power to cast any transaction with the corporation in a form most favorable to him. The basic question of whether the notes were partly paid in prior years is one of fact—what the parties actually did in those prior years. Bookkeeping is the recording of action taken so, ordinarily, the bookkeeping entry establishes the fact of the action taken. But bookkeeping entries are not conclusive. *Helvering* v. *Midland Mutual Life Insurance Co.*, 300 U. S. 216. The evidentiary value of a bookkeeping entry is further weakened when it obviously is one that is strange to accepted bookkeeping practice.

The Commissioner had a right to examine the actions of the parties to the notes for any year after they were executed to see if in fact the note indebtedness was partly paid. Here he examines the actions of the parties to the notes in the year 1944 at a time when, admittedly, the payor of the notes paid the payee, petitioner, $180,000. This he had a right to do and petitioner's argument that he is opening up a year that is barred by the statute of limitations is without merit. The Commissioner is not seeking to tax petitioner with any income he might have received that year. He is merely examining a transaction that occurred that year to see whether or not it resulted in payment of part of the note indebtedness.

The whole case comes down to the effect that is to be given to the transaction of October 31, 1944, whereby the corporation credited taxpayer's open account with $180,000. The petitioner here asserts this $180,000 credit was, to the extent of the payment out of earned surplus ($171,920.38), a dividend distribution to him. The respondent asserts it was a credit on the corporation's note indebtedness of $200,000 to petitioner. The determination as to who is right with respect to this 1944 transaction will decide the case. If the petitioner is right then the 1947 payment to him of $200,000 merely repaid his loan. If the respondent is right, the $200,000 loan was paid down to $20,000 by the $180,000 credit in 1944, so the 1947 payment of $200,000 was, to the extent of the earned surplus ($82,522.06), income.

Petitioner argues he and the corporation "elected to treat said charge of said $180,000.00, as a return of capital" though he admits such treatment would result in the payment of a taxable dividend to him under section 115 of the Internal Revenue Code of 1939. Respondent argues it was "obviously erroneous" to charge the capital account with this $180,000 credit payment; that such an offsetting entry in the capital account would have been proper only if it repre-

sented redemption of stock or was the result of a liquidation or partial liquidation of the corporation. Petitioner admits there was no cancellation of stock or planned liquidation involved and he does not seem to defend the offsetting entry in the capital account as being proper under good accounting practice. He admits the $180,000 credit had to be treated as a distribution of earned surplus to him or as a payment on his notes. He argues it cannot be treated as payment on the notes because no offsetting entry was made in the note account. His argument is it was the distribution of earned surplus to him, or, in other words, a dividend distribution.

Since the offsetting entry—the debit to the capital account—does not clearly reflect what actually occurred, we have a right to look at other facts, and the actions of the parties to the note obligations. Petitioner asserts the credit was a dividend distribution. But this corporation, almost wholly owned and controlled by petitioner, had never declared any dividends. There was another stockholder holding 4,167 shares, who received nothing if the major portion of the $180,000 credit is called a dividend. While there is no need that a divided distribution be pro rata among stockholders, the fact that a payment is made to one and not the others militates against its being called a dividend when it can fairly be explained it is not.

Both of the $100,000 notes were past due at the time the $180,000 credit was made. These two notes appear to be the corporation's only indebtedness to petitioner. In any controversy between the parties to the notes there would be a presumption that any payment by the payor to the payee was to apply on the outstanding indebtedness.

Now let us look at the actions of the payee, the petitioner, at the time he received this $180,000 credit from the payor of the notes. Do his actions show he treated it as a distribution of dividends? Clearly they do not. He did not report it as dividend income in his income tax return for 1944. All of his actions are consistent with the receipt of the $180,000 as payment on his notes and inconsistent with his treatment of the payment as income to him.

In *Crane* v. *Commissioner*, 68 F. 2d 640, there was involved the right of the taxpayer to the benefit of an expenditure made by his lessee when the taxpayer failed to report or to pay a tax in the appropriate year or years upon income received by virtue of the lessee's expenditure. In the course of the opinion, it is stated:

This obligation to report and pay a tax was never performed, and cannot now be enforced against the petitioner, because it is barred by the statute of limitations. The petitioner urges that he is entitled to the benefit of the statute of limitations, and so he is. The obligation can no longer be enforced. But the failure, however innocent, to report this income, constituted in effect a statement that no such income was received, * * *

As stated earlier, we have a right to consider the fact that petitioner was the president of and controlled the corporation. If he had wanted the books to show a dividend payment to him he could have caused the books to show the usual entries that record distribution of dividends. We are not so naive as to think petitioner would ever claim the unclear book entries show a dividend distribution to him, were it not for the fact that the income tax on such distribution is now barred.

There is nothing in the record to show petitioner was unfamiliar with the income tax laws. Presumably he paid income tax on the earnings of his business in the years prior to 1943. He in effect incorporated his going business in 1943 and he wants us to conclude the next year he took $171,920.38 worth of earnings from his business and paid no tax. We only treat the $180,000 credit as he, by his actions, showed he treated it when we hold it was payment on the notes and not a taxable transaction.

Under all of the special facts of this case we find the petitioner did receive payment on his notes in the sum of $180,000 on October 31, 1944. Therefore the distribution of $200,000 in 1947 to the petitioner resulted in a taxable dividend to him of $82,522.06, the amount of the corporation's earnings and profits at the end of that year.

Reviewed by the Court.

*Decision will be entered for the respondent.*

MURDOCK, *J.*, dissenting: Labored reasoning is used in the prevailing opinion to bail out the Commissioner after the statute of limitations has run against an earlier year in which he should have taken the action which he is now taking. The courts have held repeatedly against that. *Ross* v. *Commissioner*, 169 F. 2d 483; *Commissioner* v. *Dwyer*, 203 F. 2d 522, 524; *Richard K. Mellon*, 12 T. C. 90, 110; *American Light & Traction Co.*, 42 B. T. A. 1121, affd. 125 F. 2d 365; *Tide Water Oil Co.*, 29 B. T. A. 1208; *James Couzens*, 11 B. T. A. 1040,

The petitioner advanced $200,000 to the corporation, received the notes of the corporation for that amount and held those notes until the corporation repaid him $200,000 in 1947, at which time the notes were canceled. Thus in form and in the accounting by the corporation these were bona fide loans which were paid off in 1947. The question then would be what justification is there for disregarding the form of these transactions to hold that the substance was entirely different. The corporation carried a personal account on its books under the petitioner's name which at times had a credit balance and at other times had a debit balance. The debit balance in 1944 was slightly in excess of $200,000. The corporation at that time credited

$180,000 to that account of the petitioner on its books and at the same time debited capital. The opinion holds contrary to the evidence, that the $180,000 was a payment on the notes. The Commissioner, if he had any doubt about that crediting, should have held for that year that it was the equivalent of the distribution of a taxable dividend. He would undoubtedly prefer that position if both years were open, for in that year the earnings available for a dividend were far in excess of the earnings available in 1947. The petitioner's failure to report the taxable dividend for 1944 was not a misrepresentation, since at most that would have been his own interpretation of the law. *Commissioner* v. *American Light & Traction Co.*, *supra; Ross* v. *Commissioner*, *supra*. We should not hold that there was a distribution of a taxable dividend in 1947 merely because the Commissioner now finds it too late to go back to 1944.