ALLEN D. UNVERT AND CATHERINE R. UNVERT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8690–76.      Filed August 8, 1979.

*Donn Kemble* and *Joseph LaTorre,* for the petitioners.
*Kenneth G. Gordon,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency of $44,405 in petitioners' Federal income tax for 1972. The issue for decision is whether $54,500 received in 1972 as a refund of prepaid interest which was claimed and allowed as a deduction in petitioners' 1969 income tax return is taxable in the later year.

---

[15]Whether the value of the automobiles supplied was additional income to James for the years in issue is not before us.

## FINDINGS OF FACT

Petitioners Allen D. Unvert and Catherine R. Unvert, husband and wife,[1] were legal residents of Newport Beach, Calif., at the time their petition was filed. They filed their joint Federal income tax return for 1972 with the District Director of Internal Revenue for the District of Los Angeles, Fresno, Calif.

Petitioner Allen D. Unvert (petitioner) is a physician. In late 1969, concerned about the rate of taxation on the income from his medical practice, petitioner requested Walter P. Gribben (Gribben), an attorney, to suggest investments which would serve as tax shelters. Gribben referred petitioner to John B. Halverson (Halverson), an acquaintance of both men and a law school classmate of Gribben. In mid-December 1969, petitioner telephoned Halverson, then president of U.S. Financial Corp.,[2] and Halverson told petitioner he would make inquiries on the latter's behalf. Having heard nothing further from Halverson, petitioner again telephoned him on December 30, 1969. They agreed to meet the next day in San Diego to discuss an investment opportunity.

On the afternoon of December 31, 1969, petitioner met with Halverson as well as with Robert M. Walters, a founder and the chairman of the board of U.S. Financial Corp., and David G. Leaverton (Leaverton), house counsel. He was informed of an opportunity to purchase 16 condominium units in a large building owned by U.S. Financial Corp.; these units were identified on a list shown petitioner at the meeting. The representatives of U.S. Financial proposed that petitioner purchase the units on a contract of sale. The amount of the purchase price would be loaned petitioner by U.S. Financial.[3]

According to U.S. Financial, it was anticipated that most of the units would be sold during the following year. Sales prices were expected to be in an aggregate amount which would exceed the sales price to petitioner, thus enabling him to pay off the loan to U.S. Financial and to realize a profit as well.

---

[1] Petitioners were married in 1972.

[2] Petitioners have asked us to take judicial notice under rule 201, Federal Rules of Evidence, of several newspaper articles concerning U.S. Financial Corp. In our view, these articles, set out in appendix I to petitioner's brief, contain no material relevant to the U.S. Financial Corp. transaction at issue here. Accordingly, we decline to take judicial notice of them.

[3] Apparently, related companies were to be involved in aspects of the transaction—Swan Constructors, Inc., in the sale, and U.S. Mortgage in the loan. We will for the most part refer to U.S. Financial rather than to the other companies.

Petitioner was informed that by writing a check for prepaid interest on the loan, he would secure an interest deduction for 1969. Petitioner agreed to these terms. At the meeting, petitioner gave the others a personal check in the amount of $54,500 payable to U.S. Mortgage. On the check he indicated that the payment was to serve as prepaid interest on the loan of the purchase price of the condominiums. He was given a receipt for the payment.[4] Due to the late hour of the meeting, the representatives of U.S. Financial informed petitioner that the various documents related to the transaction could not be prepared until the following year. Petitioner made no objection and left the meeting with the belief that he had entered into a contract for the purchase of the condominium units.

During March 1970, petitioner became concerned that he had received no documentation of the condominiums purchase from U.S. Financial. He was reassured by Gribben that the documentation would be forthcoming and by John Leventis (Leventis), petitioner's accountant, that his check was adequate proof of the existence of the contract. To compute depreciation, Leventis telephoned U.S. Financial to confirm the purchase price. On his tax return for 1969, petitioner deducted as prepaid interest $54,500 and as depreciation on the units $1,239.58.

Having made several telephone calls to representatives of U.S. Financial to request the documents relating to the purchase, petitioner wrote Halverson a letter dated April 23, 1970, in which he expressed his concern at the delay in receiving documents "regarding the contractual relation we entered at the end of 1969." He asked for information and proposed a meeting to resolve possible difficulties. Under cover of a letter dated June 16, 1970, Leaverton forwarded to petitioner copies "of the proposed documentation." By a letter dated December 23, 1970, Gribben suggested that Halverson meet with petitioner about the "substantial amount of documentation remaining to be done."

When preparing his 1970 income tax return, petitioner was still concerned at his failure to receive documentation and an accounting of the 1969 transaction. By a letter dated March 24, 1971, he asked Halverson for information and indicated he would

---

[4] The parties have stipulated that petitioner was given a receipt. At trial, without objection, petitioner testified that he was given no receipt and that he believed the canceled check would serve as one.

be willing to discuss any problems at a meeting. He informed Gribben of this letter by a letter dated the same day. After telephone calls made by petitioner and Leventis yielded no results, the two met with Halverson and Leaverton in mid–1971. At this meeting, petitioner was informed that the condominium units had not been sold and that U.S. Financial had not decided how to arrange the bill of sale.

By a letter dated August 9, 1971, Leaverton informed Gribben that:

My client, Swan Constructors, Inc., hereby agrees to purchase your client Dr. Dale Unvert's position in the above-referenced condominium units on or before December 1, 1971 for the sum of $54,000 cash (less any cash theretofore received by Dr. Unvert by reason of such investment), upon the demand of Dr. Unvert.

In a letter to petitioner dated September 1, 1971, the controller of U.S. Financial, Gary L. Fitzgerald, enclosed a promissory note, a contract of sale and purchase, and a management agreement, which were designed to document the December 31, 1969, transaction. He requested that petitioner execute the documents and return them. He indicated that he would then return "the completely executed documents" to petitioner. In the letter, he refers to a letter written by Leaverton to Gribben, apparently that of August 9, 1971, which he terms a "letter of indemnification."

By a letter dated September 20, 1971, Gribben forwarded to Leaverton a promissory note in the amount of $50,000 and an executed copy of the management agreement, both of which were signed by petitioner. As he indicates in the letter, the promissory note is dated December 31, 1969; Gribben states that "it is clear that this Promissory Note evidenced part of the original purchase price." He mentions that he has asked petitioner to sign the contract of sale and purchase agreement, which petitioner "unfortunately neglected to sign." He further refers to Leaverton's statement in the August 9, 1971, letter that Swan Constructors, Inc., would purchase petitioner's interest in the condominiums.

In August or September 1971, petitioner and his accountant met with U.S. Financial's in-house accountant. When informed by the accountant that "the deal [would] be consummated" only if petitioner invested an additional $55,000, petitioner refused. At this point, petitioner asked Gribben to represent him in

obtaining a refund of the original investment from U.S. Financial.

Petitioner believed until at least April 15, 1972, that he owned the condominiums. He also believed that during 1970 and 1971 some of the condominiums were leased under the management agreement and that some were sold and others substituted by U.S. Financial. On his 1970 and 1971 income tax returns, he deducted losses connected with the investment.

On or about May 1, 1972, following a series of contacts by Gribben in person, over the telephone, and by letter, which included a threat of legal action, petitioner received a personal check from Walters in the amount of petitioner's December 31, 1969, check. Petitioner informed Leventis of his receipt of the money.

On August 14, 1972, Revenue Agent Gerald Lenning (Lenning) contacted petitioner concerning an audit of petitioner's 1970 and 1971 income tax returns. On October 11, 1972, Lenning met with Leventis with regard to the audit. At the meeting, Lenning gave Leventis a documented request for additional information about several items on the return, including petitioner's deductions related to U.S. Financial. Despite repeated requests for information, neither petitioner, Leventis, nor Gribben supplied any information to Lenning about the U.S. Financial transaction. Leventis supplied Lenning with information on other items.

On or about June 7, 1973, Lenning first obtained information on the U.S. Financial transaction from the San Diego Office of the Internal Revenue Service. On July 11, 1973, Lenning informed Leventis of his position that petitioner's purchase of the units was never completed. Leventis disagreed with Lenning. Petitioner's representatives did not comply with requests for more information on the transaction submitted by Lenning on July 23, 1973, July 30, 1973, September 28, 1973, and December 21, 1973.[5] In August 1973, Lenning issued to petitioner a revenue agent's report. On or about October 15, 1973, petitioners filed their 1972 income tax return, on which they did not report the $54,500 received in 1972.

---

[5]By September 1973, Leventis was no longer serving as petitioner's accountant. Later contacts were with petitioner's attorney, Donn Kemble, and new accountant, Pete Helsley.

OPINION

Because petitioner received a "tax benefit" from the deduction of the $54,500 as interest on his 1969 return, he is, in respondent's view, required to include that amount in his income for 1972, the year in which the deducted amount was refunded to him. Petitioner implicitly concedes that he would be required to include the refund in his 1972 income if the deducted amount in fact represented interest relating to a valid contract to purchase condominium units.[6] Since it subsequently became evident that the condominiums' purchase was never consummated, however, petitioner contends that the 1969 deduction was erroneous and that, consequently, the "tax benefit" rule does not apply. To support this position, petitioner relies mainly on *Canelo v. Commissioner*, 53 T.C. 217 (1969), affd. per curiam on other grounds 447 F.2d 484 (9th Cir. 1971), and *Streckfus Steamers, Inc. v. Commissioner*, 19 T.C. 1 (1952).

We hold for respondent.

Although each taxable period is separate and independent, there are situations in which the proper treatment of an item in one year cannot be resolved without reference to events in a prior year. See, e.g., *Dobson v. Commissioner*, 320 U.S. 489 (1943), rehearing denied 321 U.S. 231 (1944). When an amount is deducted from gross income in one year and recovered in a subsequent year, such amount is taxed in the later year if a tax benefit was realized from the deduction. *Merchants Nat. Bank v. Commissioner*, 199 F.2d 657, 659 (5th Cir. 1952), affg. 14 T.C. 1375 (1950); *Putnam Nat. Bank v. Commissioner*, 50 F.2d 158 (5th Cir. 1931), affg. 20 B.T.A. 45 (1930). The reason for this rule is clear, as explained in *Estate of Block v. Commissioner*, 39 B.T.A. 338, 341 (1939), affd. sub nom. *Union Trust Co. v. Commissioner*, 111 F.2d 60 (7th Cir. 1940), cert. denied 311 U.S. 658 (1940):[7]

When recovery or some other event which is inconsistent with what has been done in the past occurs, adjustment must be made in reporting income for the

---

[6]Apparently, as late as 1975, petitioner contended that the transaction was a valid purchase. It is stipulated that a notice of deficiency was issued on Mar. 18, 1975, to petitioner, denying claimed losses for 1970 and 1971 in connection with this transaction, and that a Tax Court case was instituted. Subsequent to the filing of the answer in that case, petitioner conceded that respondent had correctly denied those deductions.

[7]While the tax benefit rule had its genesis in court decisions, it is now implicitly codified in sec. 111, I.R.C. 1954, relating to recovery exclusions. *West Seattle National Bank of Seattle v. Commissioner*, 288 F.2d 47, 48–49 (9th Cir. 1961), affg. 33 T.C. 341 (1959).

year in which the change occurs. No other system would be practical in view of the statute of limitations the obvious administrative difficulties involved, and the lack of finality in income tax liability, which would result.

The instant case is a classic one. Petitioner deducted his 1969 payment to U.S. Financial Corp. as interest, thereby realizing a tax benefit. In 1972, the amount previously deducted was refunded to him. Under the tax benefit rule, the return to him of money which had been the subject of the income tax deduction in the prior year requires that the money be treated as income in the year of recovery.

We think petitioner's reading of *Streckfus Steamers, Inc. v. Commissioner, supra,* and *Canelo v. Commissioner, supra,* is too broad. In *Streckfus Steamers,* the taxpayer, on the accrual basis, claimed and was allowed on its 1940 return a deduction for Illinois sales tax; the taxpayer had not paid the tax and continued to contest it. After the Illinois court held the taxpayer was not liable for the tax, the Commissioner sought unsuccessfully to include in the taxpayer's 1943 gross income a sum equal to the 1940 deduction. Similarly, in *Canelo,* the taxpayers, members of a cash basis law partnership, deducted litigation expenses advanced under reimbursement agreements signed by their clients. The Court held that the advanced expenses were loans and were not deductible for years not barred by limitations. It refused to allow the Commissioner to include in current income reimbursements received by the taxpayers for advances made and deducted in earlier barred years. Because the deductions were improper when taken, the Court held that the tax benefit rule did not apply.

In those cases, the taxpayer did not switch the position taken in the year for which the deduction was allowed. The taxpayer in *Streckfus Steamers* claimed the deduction for 1940, and it was allowed by mutual mistake. After the Illinois court held the taxpayer did not owe the deducted tax and the Supreme Court clarified the law on timing of the deduction for contested liabilities,[8] the Commissioner switched his position and sought to include the deducted amount in income for a later year. Similarly, in *Canelo,* the taxpayer contended even at the time of

---

[8]*Security Mills Co. v. Commissioner,* 321 U.S. 281 (1944); *Dixie Pine Co. v. Commissioner,* 320 U.S. 516 (1944).

trial, that the advanced legal experses were deductible in the year in which they were incurred.

In contrast, petitioner claimed the $54,500 deduction on his 1969 return and thus declared that he had paid that amount as interest in 1969. The representation was accepted by the Internal Revenue Service as true, and the 1969 deduction was not disallowed. But now petitioner has shifted his position. He maintains that the payment was not interest, in effect claiming that the declaration in his 1969 return was untrue. Since the Internal Revenue Service did not notice his mistake before the statute of limitations expired, petitioner argues that no adjustment can be made with respect to the erroneously claimed interest deduction either for 1969, the year of the deduction, or for 1972, the year in which he received the refund.[9]

Because "it is no more right to allow a party to blow hot and cold as suits his interest in tax matters than in other relationships," courts have held a taxpayer to a duty of consistency in his tax treatment of related items.[10] *Alamo Nat. Bank v. Commissioner*, 95 F.2d 622, 623 (5th Cir. 1938), affg. 36 B.T.A. 402 (1937), cert. denied 304 U.S. 577 (1938). The duty of consistency precludes a taxpayer who has received a tax benefit due to his treatment of an item in a year barred by the statute of limitations from claiming that the original treatment was incorrect and thus obtaining a tax advantage in a later year. Disapproving of such a shift of position on the part of the taxpayer before it, the Fifth Circuit has observed (*Johnson v. Commissioner*, 162 F.2d 844, 846 (5th Cir. 1947)):

This court has several times held that when a transaction and its tax consequences are thus projected into other tax years there is a duty of consistency as to its treatment, and one should be held to the consequences of the initial treatment, *though inaccurate*, when a correction throughout is impossible. [Emphasis added.]

This doctrine applies "even though all the technical elements of estoppel are not present." *Continental Oil Co. v. Jones*, 177

[9]Although the record is not entirely clear on this point, the refund could be interpreted as constituting a rescission of a valid contract. If so, the initial deduction was not erroneous and the tax benefit rule would clearly apply.

[10]On Jan. 2, 1979, respondent filed a motion for leave to file amended answer to conform the pleadings to the proof, under Rule 41(b), Tax Court Rules of Practice and Procedure. The motion requested leave to amend the pleadings to reflect the doctrine of quasi-estoppel or duty of consistency. Upon due consideration, we find that the issue has been tried by the consent of the parties. Accordingly, we have granted respondent's motion to amend the pleadings.

F.2d 508, 512 (10th Cir. 1949), cert. denied 339 U.S. 931 (1950). Accord, *Orange Securities Corp. v. Commissioner*, 131 F.2d 662, 663 (5th Cir. 1942). The Eighth Circuit has recently enumerated the prerequisites for application of the doctrine, also termed "quasi-estoppel," as follows (*Beltzer v. United States*, 495 F.2d 211, 212 (8th Cir. 1974)):

> (1) the taxpayer has made a representation or reported an item for tax purposes in one year,
> (2) the Commissioner has acquiesced in or relied on that fact for that year, and
> (3) the taxpayer desires to change the representation, previously made, in a later year after the statute of limitations on assessments bars adjustments for the initial tax year.

See also *Hess v. United States*, 210 Ct. Cl. 483, 537 F.2d 457, 463 (1976), cert. denied 430 U.S. 931 (1977), which applies the three elements laid out in *Beltzer*.[11]

Relying on this doctrine, certain cases have applied the tax benefit rule to a taxpayer who erroneously claimed a deduction in one year, recovered the amount of that deduction in a later year, and then shifted his position in the later year as to the controlling facts. See *Askin & Marine Co. v. Commissioner*, 66 F.2d 776, 778 (2d Cir. 1933), affg. 26 B.T.A. 409 (1932), and *Commissioner v. Liberty Bank & Trust Co.*, 59 F.2d 320, 325 (6th Cir. 1932), revg. and remanding 14 B.T.A. 1428 (1929) (debts charged off as worthless in an earlier year and collected in a later year); *Mayfair Minerals, Inc. v. Commissioner*, 56 T.C. 82 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972) (refunds ordered by Federal Power Commission deducted as accrued liabilities and order later rescinded); *Faidley v. Commissioner*, 8 T.C. 1170, 1173 (1947) (loss claimed in an earlier year and recovered from the estate of a guarantor in a later year).

In a number of other contexts, courts have refused taxpayers benefits from treating items in a manner inconsistent with that of barred years. E.g., *Robinson v. Commissioner*, 181 F.2d 17 (5th

---

[11]In contrast, for the more stringent requirements of "pure" estoppel to apply (*United States v. S.F. Scott & Sons*, 69 F.2d 728, 732 (1st Cir. 1934)—

"(1) there must be false representation or wrongful misleading silence. (2) The error must originate in a statement of fact and not in an opinion or a statement of law. (3) The person claiming the benefits of estoppel most be ignorant of the true facts, and (4) be adversely affected by the acts or statements of the person against whom an estoppel is claimed."

Accord, *Tide Water Oil Co. v. Commissioner*, 29 B.T.A. 1208, 1218–1219 (1934).

Cir. 1950), affg. 12 T.C. 246 (1949) (amount erroneously deducted in barred year could not be deducted in later year); *Wichita Coca-Cola Bottling Co. v. United States*, 152 F.2d 6 (5th Cir. 1945), cert. denied 327 U.S. 806 (1946) (income omitted in barred year taxed in later year); *Bothwell v. Commissioner*, 77 F.2d 35 (10th Cir. 1935), affg. 27 B.T.A. 1351 (1933) (failure to report fair market value of property received as compensation prevented use of such value as basis); *Griffith v. United States*, an unreported case (N.D. Tex. 1971, 27 AFTR 2d 754, 71–1 USTC par. 9280) (value of property reported on estate tax return by taxpayer as administratrix held basis for computing gain on disposition).

Petitioner acknowledges this line of cases but argues that they apply only to those he deems "bad guys"; he maintains that his behavior has been innocent. We are not persuaded by this argument.[12] The cases cited by petitioner do not support his position that a taxpayer who innocently misrepresented a fact in a barred year may freely switch his position to achieve a tax advantage in a later year. These cases rely in part on other factors, such as the availability of the true facts to the Commissioner during the period before the statute of limitations ran. *Ross v. Commissioner*, 169 F.2d 483, 495–496 (1st Cir. 1948), revg. a Memorandum Opinion of this Court; *Studebaker-Packard Corp. v. United States*, an unreported case (N.D. Ind. 1961, 8 AFTR 2d 5058, 61–2 USTC par. 9551). Another case notes, in addition to this factor, that the erroneous deduction at issue resulted from a mistake of law. *Crosley Corp. v. United States*, 229 F.2d 376, 381 (6th Cir. 1956). It is well settled that estoppel does not apply to mistakes of law (see *United States v. S. F. Scott & Sons*, 69 F.2d 728 (1st Cir. 1943)), but before a mistake of law can occur both parties must know the facts. *Mayfair Minerals, Inc. v. Commissioner*, 56 T.C. at 93.

Other cases are inapposite in that they involve a change of position not by the taxpayer but by the Commissioner. *Commissioner v. Schuyler*, 196 F.2d 85 (2d Cir. 1952), affg. a Memoran-

---

[12]In *Mayfair Minerals, Inc. v. Commissioner*, 56 T.C. 82, 91 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972), we stated that *Canelo v. Commissioner*, 53 T.C. 217 (1969), affd. per curiam 447 F.2d 484 (9th Cir. 1971), and *Streckfus Steamers, Inc. v. Commissioner*, 19 T.C. 1 (1952) —

"are clearly inapposite where the taxpayer, *either deliberately or unintentionally*, misleads the Commissioner through erroneous representations of fact in his returns, and the Commissioner, consequently, allows the statute of limitations to run on adjustments of taxable income on the misleading returns." [Emphasis added.]

dum Opinion of this Court; *Twitchco, Inc. v. United States*, 348 F. Supp. 330 (M.D. Ala. 1972). In another, the Commissioner apparently did not rely on the doctrine of quasi-estoppel. *B. C. Cook & Sons, Inc. v. Commissioner*, 59 T.C. 516 (1972). In the final case upon which petitioner relies, the taxpayer did not switch his position after an earlier year was barred but rather urged that an erroneous deduction be allowed for the year at issue on the grounds that the Commissioner could later rely on the tax benefit rule and include the amount in income. *LaCroix v. Commissioner*, 61 T.C. 471 (1974).

Even assuming the duty of consistency or quasi-estoppel does not apply to the innocent, we are not persuaded by petitioner's protestations of what he terms his "pure heart." He claims his belief that the 1969 transaction constituted a valid contract lasted until after April 15, 1973, when the statute of limitations for 1969 expired. He was shaken in this belief, he asserts, only in August 1973, when he read Lenning's report which stated that the sale of the condominiums was never completed. Upon receiving the May 1972 check for $54,500, petitioner, according to his varying accounts, either did not think of the tax consequences, or believed that the check represented part of the sale price to Swan Constructors, Inc., and that it would therefore be reported on his 1972 return, or continued to believe that he still owned the condominiums. He explains his failure to report the amount on his 1972 income tax return as due to his realization, after the statute of limitations for his 1969 return had run but before he filed his 1972 return on October 15, 1973, that he had not in fact owned the condominiums.

We find petitioner's statements inconsistent, both internally and with his contemporaneous actions. We find it incredible that upon merely reading Lenning's report, petitioner would abandon his long-held belief that the 1969 transaction constituted a valid contract. As one of the parties involved, he had knowledge of facts which Lenning lacked. Moreover, at the time petitioner now claims he realized there had been no contract, Leventis was disputing this finding with Lenning. Petitioner failed to include the $54,500 amount on his 1972 return, an action consistent only with the very position advanced by Lenning which petitioner and his representatives were then disputing.

As to his view of the May 1972 check, we are unable to determine among his spate of accounts what petitioner did in

fact think. We note, however, that the view that the refund was a sale, one which petitioner concededly did not advance on his 1972 return, appears unreasonable. At one point, he states that he viewed the check as carrying out the August 1971 offer to buy his position in the condominiums. Yet the offer was made months earlier and there is nothing to indicate that the May 1972 transaction was intended to carry out that offer. Moreover, his instructions to Gribben "to get * * * [the] money back" are inconsistent with a theory of sale.

In light of petitioner's repeated earlier references to his belief in the existence of a contract and the lack of evidence that the 1969 payment was a deposit, we think petitioner was attempting to retrieve not a deposit but rather an amount paid for which petitioner had belatedly discovered that a contract might not exist. If petitioner believed no contract existed in May 1972, he was under the duty prescribed by section 1.461–1(a)(3)(i), Income Tax Regs., to file an amended return. Even if he was unaware of this duty, he was aware of the audit of his 1970 and 1971 returns. Yet his representatives repeatedly withheld from Lenning information in regard to the U.S. Financial Corp. transaction. A taxpayer may be charged with responsibility for actions involving his income tax returns which he has entrusted to his accountant. *Bartel v. Commissioner*, 54 T.C. 25, 30–31 (1970). Therefore, even if petitioner was innocent at the time of filing the 1969 return, we think his actions from at least August 1972 to April 15, 1973, when the 3-year statute of limitations ran on the assessment of a deficiency for 1969, constituted wrongful misleading silence as to the treatment of the condominiums transaction on his 1969 return.

To reflect the foregoing,

*Decision will be entered for the respondent.*