BRUCE F. AND JUDY E. JOHNSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE,Respondent * Johnson v. Commissioner
Docket Nos. 546-83, 34606-83, 2502-84
United States Tax Court
T.C. Memo 1993-178; 1993 Tax Ct. Memo LEXIS 188; 65 T.C.M. (CCH) 2465; April 22, 1993, Filed *188 An order will be issued granting the motion for reconsideration, deciding this controverted issue for petitioners, and directing the parties to submit their computations for entry of decision pursuant to Rule 155. For petitioners: Robert H. Aland and L.G. Harter III. For respondent: Alan M. Jacobson. DAWSON
DAWSON
SUPPLEMENTAL MEMORANDUM OPINION DAWSON, Judge: This case is presently before the Court on respondent's motion for reconsideration of the Memorandum Findings of Fact and Opinion, T.C. Memo. 1992-369, which adopted the opinion of Special Trial Judge Stanley J. Goldberg. We did not consider an issue that must be decided prior to the submission of Rule 155 computations. [2] That issue is whether gains on the closing of straddles established in years prior to the years in issue should be treated as long-term or short-term capital gains. *189 The facts necessary for the disposition of this issue are contained in the record and are found accordingly. Inasmuch as only petitioner husbands engaged in commodities transactions, hereafter only the husbands will be referred to as petitioners. For their first years in issue, petitioners reported gains from straddles on which they had realized losses in a prior year. For 1978, Bruce F. Johnson reported a long-term capital gain of $ 6,886,136 from various straddles, of which respondent determined that $ 5,682,531 was from closing the gain legs of 1977-78 straddles on the London Metal Exchange. For 1978, Steven G. Newcom reported a long-term capital gain of $ 1,067,241 from closing of 1977-78 London straddles. For 1977, Tommy K. Crouch reported a long-term capital gain of $ 932,975 from closing of 1976-1977 London straddles. Although we concluded in Johnson v. Commissioner, T.C. Memo. 1992-369, that these transactions were shams, not to be recognized for tax purposes, we held that petitioners are required, by the duty of consistency, to recognize gains from straddles for which losses were recognized in prior years. Respondent's position is that *190 petitioners' straddles, which had a holding period of more than 6 months but less than 1 year (less than 9 months for tax year 1977), do not qualify for long-term capital gains treatment under section 1222. Respondent determined that these transactions do not fulfill the requirements of section 1222, because (1) they were not "futures transactions", and (2) they were not conducted "subject to the rules of a board of trade or commodity exchange". Petitioners' position is that their capital gains are long-term because section 1222 provides that a 6-month holding period applies to futures transactions subject to the rules of a board of trade or commodity exchange. In general, section 1402(a)(1) of the Tax Reform Act of 1976, Pub. L. 94-455 (1976), 90 Stat. 1520, 1731, amended section 1222 to extend the minimum holding period required for long-term capital gain treatment from 6 months to 1 year (9 months for 1978) beginning in 1977. Section 1222 provides, in relevant part, as follows: For purposes of this subtitle-- (3) Long-term capital gain. The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months [9 months for *191 taxable years beginning in 1977 and 1 year for taxable years beginning after 1977], if and to the extent such gain is taken into account in computing gross income. * * *
For purposes of this subtitle, in the case of futures transactions in any commodity subject to the rules of a board of trade or commodity exchange, the length of the holding period taken into account under this section or under any other section amended by section 1402 of the Tax Reform Act of 1976 shall be determined without regard to the amendments made by subsections (a) and (b) of such section 1402.
In other words, the holding period of 6 months continues to apply in the case of commodity futures transactions "subject to the rules of a board of trade or commodity exchange". Respondent makes two arguments as to why petitioners' transactions were not "futures transactions" within the meaning of section 1222. First, it is argued that, because this Court found petitioners' straddle transactions to be factual shams, such transactions "cannot be held to be futures transactions in any commodity". Respondent agrees that the duty of consistency applies to require petitioners to recognize their gains from *192 straddles in which losses were recognized in prior years. It is well established that, when a taxpayer has received a benefit in a prior, closed year, he may not change his position so as to receive a second benefit, even though the position in the later year may be erroneous. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986) (applying the doctrine of duty of consistency to straddles which lack tax effect); Unvert v. Commissioner, 72 T.C. 807 (1979), affd. 656 F.2d 483 (9th Cir. 1981). If this duty applies, the Commissioner may act as if the previous representation continues to be true, even if it is not. The taxpayer is estopped to assert the contrary. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). Respondent now seeks to require consistency as to one aspect of the transaction -- that gain must be recognized -- but to invoke the doctrine of sham transaction in order to ignore petitioners' *193 prior representations as they would affect the holding period of their futures contracts. In applying the duty of consistency, we may not allow respondent to pick and choose among petitioners' prior representations, selecting those which favor respondent and rejecting those which favor petitioners. To do so would undermine the doctrine of duty of consistency which, in effect, must be applied in a consistent manner. Respondent's second argument is that petitioners' straddles were not "futures contracts" but "forward contracts". The significance of the distinction is that the Commodity Exchange Act (1936), ch 545, 49 Stat. 1491, as amended and currently reported at 7 U.S.C. sec. 6 (1988), requires that futures contracts be sold on a board of trade which has been designated by the Commodity Futures Trading Commission (CFTC) as a "contract market". "Futures contracts" and "future delivery" are defined so as to exclude "any sale of any cash commodity for deferred shipment or delivery", id., sec. 2. Contracts for "deferred shipment or delivery" are forward contracts. If petitioners' contracts were forward contracts they would not fall within the *194 definition of "futures transactions" in section 1222. Respondent seems to argue that because petitioners' straddle transactions were executed on an unregulated principal-to-principal market, they were therefore forward contracts. We think respondent's position on this issue is strained. Initially we note that section 1222 applies to "futures transactions", which we take to be a more all-encompassing term than either "futures contracts" or "forward contracts", which are terms of art in the commodities business. The treatise cited by respondent states, in essence, that the difference between forward contracts and futures contracts is that the parties to a forward contract generally intend to make and take delivery, while the parties to a futures contract are speculators who intend to close out their positions by offset before delivery. 1 Kramer, Financial Products: Taxation, Regulation, and Design, sec. 4.3(b) (1991 rev.). See Commodity Futures Trading Commission v. Co Petro Marketing Group, Inc., 680 F.2d 573, 579 (9th Cir. 1982) (surveying the legislative history of the Commodity Exchange Act to establish the same distinction); Commodity Futures Trading Commission v. P.I.E., 853 F.2d 721 (9th Cir. 1988) *195 (holding that contracts sold directly to the public for future delivery of precious metals in 90, 180, or 360 days were futures contracts). The intent of the parties determines whether a forward contract or a futures contract was contemplated. Transnor (Bermuda) Ltd. v. BP North America Petroleum, 738 F. Supp. 1472, 1489 (S.D.N.Y. 1990). It is uncontroverted that petitioners were trading in commodities as speculators with a tax motive, not with the intent of taking actual delivery. Petitioner Crouch testified that he took delivery of silver on one occasion in a later year; with this exception, actual delivery was never contemplated by petitioners. We conclude that petitioners traded in futures contracts and engaged in futures transactions within the meaning of section 1222. Respondent also determined that petitioners' trades were not "subject to the rules of a board of trade or commodity exchange" because they were not realized on a regulated commodity exchange or contract market, as required in the United States. Petitioners argue that the London Metal Exchange is clearly a commodity exchange. Their London contracts were explicitly made "subject *196 to and in accordance with the Rules and Regulations of the London Metal Exchange". In our view respondent's interpretation is at odds with the plain meaning of section 1222. Respondent reads section 1222 as if it applies only to futures contracts traded on a "qualified board or exchange", as this term is defined in section 1256(g)(7). A qualified board or exchange is defined as: (1) A national securities exchange which is registered with the Securities and Exchange Commission; (2) a domestic board of trade designated as a contract market by the CFTC; or (3) "any other exchange, board of trade, or other market which the Secretary determines has rules adequate to carry out the purposes" of section 1256. The purpose of section 1256 is to provide the system of taxation based on marking to market of regulated futures contracts. Requiring compliance with it to qualify for the 6-month holding period of section 1222 would result in domestic and foreign futures transactions being subject to different holding period rules, a result which we find to be irrational and inconsistent. Section 1256 was introduced into the Code by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. *197 172, whose effective date was June 23, 1981. The Code did not contain the concept of a "qualified board or exchange" when section 1222 was amended in 1976. We think that the terms "board of trade or commodities exchange" and "qualified board or exchange" are distinguishable concepts. The adjective "qualified" in section 1256 indicates a limitation on the concept of "board of trade" or "commodities exchange", which is not expressed in section 1222. The Commodity Exchange Act, which we find to be relevant to interpretation of the terms "board of trade or commodity exchange", defines "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling any commodity or receiving the same for sale or consignment." Supra, sec. 2. The Commodity Exchange Act provides that the CFTC shall have exclusive jurisdiction with respect to "transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange, or market". A distinction is made between a regulated "contract *198 market" and "any other board of trade, exchange or market", which may be unregulated. Supra, sec. 2. Case law interpreting these terms supports this view. The Co Petro Marketing Group, Inc. case, 680 F.2d at 581, held that, within the meaning of the Commodity Exchange Act, the term "board of trade" was to be broadly interpreted to include "an association of persons engaged in the business of selling commodities". The term "board of trade", the Court found, described the appellee's activities in acting as agent for members of the general public, purchasing contracts for fuel for future delivery and later selling the fuel on the customers' behalf. In our judgment the term "board of trade" in section 1222 should also be interpreted to include an association of persons, such as the London Metal Exchange, engaged in the business of dealing in contracts for the purchase and sale of commodities. To hold otherwise would mean that capital gains from straddle transactions conducted on an unregulated foreign market would be treated differently from otherwise similar domestic transactions. Respondent's allusion to the legislative history of section 1222 *199 is not persuasive. Congress twice considered the alternative of making the 6-month holding period available only for agricultural commodities, in the Tax Reform Act of 1976, and again in the its 1978 amendments as part of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763. Both times this proposal was rejected. The 1976 Senate Report refers to the provision of the House bill which would have restricted the 6-month long-term capital gain holding period to agricultural commodities futures contracts, but the provision was not included in the statute. In 1978, the provision was proposed and again deleted so that all commodities futures contracts would be eligible for the 6-month holding period rule. S. Rept. 94-1236, 1976-3 C.B. (Vol. 3), 811, 912; H. Rept. 95-1800, 1978-3 C.B. (Vol. 1) 521, 617. The legislative history thus confirms our analysis of section 1222 that the 6-month holding period applies to all futures contracts subject to the rules of a board of trade or commodity exchange. In addition to its appearance in section 1222, the phrase "board of trade or commodity exchange" occurs three times in the Code: sections *200 553(a)(3) (defining foreign personal holding company income), 927(c)(7) (defining FSC investment income), and 1233 (defining terms relating to capital gains and losses). We conclude that, absent any indication to the contrary, the phrase has the same meaning in each of these four code sections. Two of the provisions apply to foreign-source income, with the intent of subjecting it to U.S. taxation. Section 553(a) defines foreign personal holding company income to include "gains from futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange." Sec. 553(a)(3). Similarly, section 927(c), as effective beginning in 1985, defines "investment income" of an FSC to include "gains from futures transactions in any commodity on, or subject to the rules of, a board of trade or commodity exchange". If we were to accept respondent's interpretation of this phrase to require that a "board of trade or commodity exchange" be a regulated contract market, for purposes of these sections, we would define gains from futures transactions in such a way as to exclude income realized on unregulated foreign markets. This conclusion would be contrary to the *201 purpose of these sections, which is to include such gains in taxable income. The appearance of the phrase in section 1233(e)(2)(B), though straddles are excluded by definition in that clause, also appears to be intended to apply to both domestic and foreign transactions, rather than only to transactions on a regulated contract market. [3]
For the reasons stated, we hold that petitioners' trades were "subject to the rules of a board of trade or commodity exchange". Hence they qualify for the 6-month holding period for long-term capital gains. To reflect the foregoing, An order will be issued *202 granting the motion for reconsideration, deciding this controverted issue for petitioners, and directing the parties to submit their computations for entry of decision pursuant to Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Tommy K. and Betty L. Crouch, docket No. 34606-83, and Steven G. and Jill H. Newcom, docket No. 2502-84. * On June 29, 1992, this Court filed its Memorandum Findings of Fact and Opinion (T.C. Memo. 1992-369) in this case. On January 21, 1993, respondent filed a Motion for Special Leave to File Motion for Reconsideration of T.C. Memo. 1992-369 which was granted. Petitioners have filed a response and objection to the substance of respondent's motion for reconsideration.↩
2. All Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code in effect for the years in issue.↩
3. Section 1233(e)(2)(B) provides that, for purposes of subsections (b) and (d) of section 1233: (B) in the case of futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange, a commodity future requiring delivery in 1 calendar month shall not be considered as property substantially identical to another commodity future requiring delivery in a different calendar month.↩